STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

COMMISSION ON HUMAN RIGHTS ) CHRO CASE NO. 9340251
AND OPPORTUNITIES, ex rel )
GAIL NESTOR )
 )
Complainant, )
 )
v. )
 )
UNITED TECHNOLOGIES CORPORATION, )
PRATT & WHITNEY AIRCRAFT )
 )
Respondent. )
 )   SEPTEMBER 20, 1999

# MEMORANDUM OF DECISION WITH ORDER

Before: Paul M. O'Connor, Jr., Esq., Hearing Officer.

For the Complainant: Philip A. Murphy, Jr. Esq.
Commission Counsel
Commission on Human Rights
and Opportunities
21 Grand Street
Hartford, CT 06106

Alix Simonetti, Esq.
Assistant Commission Counsel II
Commission on Human Rights
and Opportunities
21 Grand Street
Hartford, CT 06106

Philip Steele, Esq.
5 Linden Place
Hartford, CT 06106

For the Respondent: Daniel Schwartz, Esq.
Day, Berry & Howard
City Place
Hartford, CT 06103

# I. JURISDICTION:

The hearing in this matter occurred pursuant Connecticut General Statutes §46a-84[1] and the

---

[1] § 46a-84. Complaint: Hearing. Settlement or alternative dispute resolution. Order of default, when

(a) If the investigator fails to eliminate a discriminatory practice complained of pursuant to section 46a-82 within fifty days of a finding of reasonable cause, he shall, within ten days, certify the complaint and the results of the investigation to the executive director of the commission and to the Attorney General.

(b) Upon certification of the complaint, the executive director of the commission or his designee shall appoint a hearing officer, hearing adjudicator or human rights referee to act as a presiding officer to hear the complaint or to conduct settlement negotiations and shall cause to be issued and served in the name of the commission a written notice, together with a copy of the complaint, as the same may have been amended, requiring the respondent to answer the charges of the complaint at a hearing before the presiding officer or hearing adjudicator at a time and place to be specified in the notice, provided such hearing shall be commenced by convening a hearing conference not later than forty-five days after the certification of the complaint. The hearing shall be a de novo hearing on the merits of the complaint and not an appeal of the commission's processing of the complaint prior to its certification. The hearing shall proceed with reasonable dispatch and be concluded in accordance with the provisions of section 4-180.

(c) The place of any hearing may be the office of the commission or another place designated by it.

(d) The case in support of the complaint shall be presented at the hearing by the Attorney General, who shall be counsel for the commission, or by the commission counsel as provided in section 46a-55, as the case may be. If the Attorney General or the commission counsel determines that a material mistake of law or fact has been made in the finding of reasonable cause, he may withdraw the certification of the complaint and remand the file to the investigator for further action. The complainant may be represented by an attorney of his own choice. If the Attorney General or the commission counsel, as the case may be, determines that the interests of the state will not be adversely affected, he may allow the attorney for the complainant to present all or part of the case in support of the complaint. No commissioner may participate in the deliberations of the presiding officer in the case.

(e) A hearing officer, hearing adjudicator, human rights referee or attorney who volunteers service pursuant to subdivision (16) of section 46a-54 may supervise settlement endeavors, or, in employment discrimination cases only, the complainant and respondent, with the permission of the commission, may engage in alternate dispute resolution endeavors for not more than three months. The cost of such alternate dispute resolution endeavors shall be borne by the complainant or the respondent or both and not by the commission. Any endeavors or negotiations for conciliation, settlement or alternate dispute resolution shall not be received in evidence.

(f) The respondent may file a written answer to the complaint under oath and appear at the hearing in person or otherwise, with or without counsel, and submit testimony and be fully heard. If the respondent fails to file a written answer prior to the hearing within the time limits established by regulation adopted by the commission in accordance with chapter 54 or fails to appear at the hearing after notice in accordance with section 4-177, the presiding officer or hearing adjudicator may enter an order of default and order such relief as is necessary to eliminate the discriminatory practice and make the complainant whole. The commission or the complainant may petition the Superior Court for enforcement of any such order for relief pursuant to the provisions of section 46a-95.

(g) The presiding officer or hearing adjudicator conducting any hearing shall permit reasonable amendment to any complaint or answer and the testimony taken at the hearing shall be under oath and be transcribed at the request of any party.

2

decision is rendered pursuant to Connecticut General Statutes §46a-86.[2]

## II. ALLEGED VIOLATION(S) OF LAW:

The Connecticut Supreme Court "has repeatedly held that it is the charges contained in the complaints ... that 'frame the issues to be decided by the hearing tribunal.' Groton v. Commission on Human Rights & Opportunities, 169 Conn. 89, 99, 362 A.2d 1359 (1975); Veeder-Root Co. v. Commission on Human Rights & Opportunities, 165 Conn. 318, 329, 334 A.2d 443 (1973) ..." (Citations omitted.) West Hartford v. Commission on Human Rights & Opportunities, 176 Conn. 291, 297, 407 A.2d 964 (1978). However, pleadings are liberally construed. What is necessarily implied from the language of pleading need not be expressly alleged. Wright v. Brown, 167 Conn. 464, 470 (1975). In the instant matter the Complainant, Gail Nestor ("Complainant") has alleged

---

[2] § 46a-86. Complaint: Determination; orders; dismissal

(a) If, upon all the evidence presented at the hearing conducted pursuant to section 46a-84, the presiding officer finds that a respondent has engaged in any discriminatory practice, the presiding officer shall state his findings of fact and shall issue and file with the commission and cause to be served on the respondent an order requiring the respondent to cease and desist from the discriminatory practice and further requiring the respondent to take such affirmative action as in the judgment of the presiding officer will effectuate the purpose of this chapter.

(b) In addition to any other action taken hereunder, upon a finding of a discriminatory employment practice, the presiding officer may order the hiring or reinstatement of employees, with or without back pay, or restoration to membership in any respondent labor organization, provided, liability for back pay shall not accrue from a date more than two years prior to the filing or issuance of the complaint and, provided further, interim earnings, including unemployment compensation and welfare assistance or amounts which could have been earned with reasonable diligence on the part of the person to whom back pay is awarded shall be deducted from the amount of back pay to which such person is otherwise entitled. The amount of any such deduction for interim unemployment compensation or welfare assistance shall be paid by the respondent to the commission which shall transfer such amount to the appropriate state or local agency.

(c) In addition to any other action taken hereunder, upon a finding of a discriminatory practice prohibited by section 46a-58, 46a-59, 46a-64, 46a-64c, 46a-81b, 46a-81d or 46a-81e, the presiding officer shall determine the damage suffered by the complainant, which damage shall include, but not be limited to, the expense incurred by the complainant for obtaining alternate housing or space, storage of goods and effects, moving costs and other costs actually incurred by him as a result of such discriminatory practice and shall allow reasonable attorney's fees and costs.

(d) In addition to any other action taken hereunder, upon a finding of a discriminatory practice prohibited by section 46a-66 or 46a-81f, the presiding officer shall issue and file with the commission and cause to be served on the respondent an order requiring the respondent to pay the complainant the damages resulting from the discriminatory practice.

(e) If, upon all the evidence and after a complete hearing, the presiding officer finds that the respondent has not engaged in any alleged discriminatory practice, the presiding officer shall state his findings of fact and shall issue and file with the commission and cause to be served on the respondent an order dismissing the complaint.

3

in her Affidavit of Illegal Discriminatory Practice (R-1) (hereinafter referred to as the "Complaint") that she is a female (R-1, ¶1) who, prior to her discharge, was employed by the Respondent, United Technologies Corp. - Pratt & Whitney Division ("Respondent"), for 19 years, fourteen years of which she spent as an inspector in Respondent's department 981 (R-1, ¶2). She further alleges that she was discharged by Respondent on September 2, 1992, and believes that her sex, female, was in part a factor in her termination (R-1, Preamble). She alleges that the Respondent's action in terminating her employment violated the following laws: Conn. Gen. Stat. §46a-60(a)(1)[3] and Title VII of the Civil Rights Act of 1964, as amended, as protected by Conn. Gen. Stat. §46a-58(a)[4] (R-1, Preamble).

She further alleges the following. The Respondent employs more than 15 persons (R-1, ¶3). During the period August 1990 through April 1991, she was subjected to ongoing harassment from Benjamin Elmore ("Elmore") (R-1, ¶4); The Respondent refused to assist her in eliminating the hostile working environment by refusing her request for transfer to get out of the department and away from Elmore, therefore, the personality conflict and harassment were permitted to continue (R-1, Id.) On July 20, 1992, she was waiting in line to clock her work, behind the leadman (R-1, ¶5). When the leadman finished, she proceeded to put her badge in the clock to begin her transaction (R-1, ¶6). At this time, Elmore was searching through the card rack next to the time clock (R-1, ¶7). When Elmore saw that Complainant was going to put her work in next, he yelled "Oh no you don't" and pushed her badge out of the clock, canceling her transaction (R-1, ¶8). At this time, Elmore didn't have a card to begin his transaction (of "clocking" his work) and was searching through the card rack for one. (R-1, ¶9). He refused her access to the machine to continue her transaction (R-1, Id.). Elmore then placed himself between Complainant and the clock preventing her from resuming her transaction. He again canceled her transaction, at which point a verbal confrontation ensued within earshot of the foreman who was 20 feet away in his bullpen (R-1, ¶10).

---

[3] § 46a-60. <u>Discriminatory employment practices prohibited</u>

(a) It shall be a discriminatory practice in violation of this section:

(1) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disorder, mental retardation, learning disability or physical disability, including, but not limited to, blindness;

[4] § 46a-58. <u>Deprivation of rights. Desecration of property. Cross burning. Penalty</u>

(a) It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, blindness or physical disability.

4

Elmore refused to take his thumb off the cancel key and by this time he had positioned himself behind Complainant, physically touching her (R-1, ¶11). She yelled for Elmore to "get off me" twice and began to kick Elmore (R-1, Id.). By this time, other workers had gathered and began to laugh (R-1, ¶12). Elmore yelled loudly "stop kicking me" then the foreman responded (R-1, Id.). The foreman appeared and Elmore removed his thumb from the cancel key and moved to the other side of the clock (R-1, ¶13). The foreman then directed Complainant to cease and desist but the foreman did not address Elmore until Complainant pointed out that she was the only one being ordered to stop (R-1, ¶14). On July 21, 1992, at the beginning of the shift, Complainant was informed that there would be an investigation (into the incident) conducted by internal affairs (R-1, ¶15). Complainant was reassigned to another area (R-1, ¶16). Elmore was not reassigned to a different area until near the end of the shift (R-1, ¶17). On September 2, 1992, as a result of the investigation, Complainant was terminated for violating rule #3, Fighting and Roughhousing (R-1, ¶18). She later learned that Elmore only received a one day suspension (for the incident) (R-1, Id.). Complainant believes the unequal treatment of her by Respondent with regards to the disciplinary action taken for this incident was discriminatory due to her female gender (R-1, ¶19) and had the Respondent adequately addressed the previous conflict reported to internal Security in August 1990 through March 1991, by granting Complainant's transfer request, this situation would not have occurred (R-1, ¶20).

The Respondent, in its Answer to Affidavit of Illegal Discriminatory Practice ("Answer"), admits that the Complainant is female (R-2, ¶1), that she had been a tool inspector since December 18, 1978 and worked in Department 981 since April 30, 1984 until the time of her termination (R-2, ¶2), that respondent employs more that 15 persons (R-2, ¶3), that the incident at issue occurred on July 27, not July 20, 1992 (R-2, ¶5), that Complainant was standing behind the "working leader" at the time clock (R-2, Id.), that Elmore hit the cancel button on the time clock when Complainant attempted to time out (R-2, ¶8), that Elmore persisted in canceling Complainant's efforts to ring her work on the clock (R-2, ¶11), that Complainant kicked Elmore (R-2, Id.), that the foreman directed Complainant to stop "her physical assault" on Elmore (R-2, ¶14), that Complainant was reassigned to another area at the beginning of the shift (R-2, ¶16), and that Elmore was reassigned to another area at the end of the supper break. (R-2, ¶17). The Respondent also avers that on September 2, 1992, as a result of the investigation, Complainant was terminated for violating rule #3, Fighting and Roughhousing, and that Elmore only received a one day suspension (for the incident) (R-2, ¶18). Although Respondent couches the following in terms of an "admission", it has specially alleged the following facts in its Answer which were not averred in the Complainant's Complaint. Elmore hit the cancel button on the time clock when Complainant attempted to time out "because he was in front of her" (R-2, ¶8). It further specially alleged that Complainant, in addition to kicking Elmore, "elbow[ed] him as well as direct[ed] profanity at him." (R-2, ¶11).

The Respondent, in its Answer, denies the following allegations of the Complaint: That during the period August 1990 through April 1991, Complainant was subjected to ongoing harassment from Elmore and that Respondent refused to assist her in eliminating the hostile working environment by refusing her request for transfer to get out of the department and away from Elmore, thereby allowing the harassment to continue (R-2, ¶4); that Complainant was standing in line behind the "leadman" (R-2, ¶5); that when the leadman finished (clocking out) Complainant proceeded to put her badge in the clock to begin her transaction (R-2, ¶6), that at this

5

time, Elmore was searching through the card rack next to the time clock (R-2, ¶7); that when Elmore saw that Complainant was going to put her work in next, he yelled "Oh no you don't" (R-2, ¶8); that Elmore didn't have a card to begin his transaction and was searching through the card rack for one while refusing Complainant access to the machine to continue her transaction (R-2, ¶9); that Elmore placed himself between Complainant and the clock preventing her from resuming her transaction (R-2, ¶10); at which point a verbal confrontation ensued within earshot of the foreman who was 20 feet away in his bullpen (R-2, Id.); that Elmore had positioned himself behind Complainant, physically touching her (R-2, ¶11); that Complainant yelled for Elmore to 'get off me' twice (R-2, Id.); that other workers had gathered and began to laugh (R-2, ¶12); that Elmore yelled "stop kicking me" and the foreman responded (R-2, Id.); that the foreman appeared and Elmore removed his thumb from the cancel key - moving to the other side of the clock (R-2, ¶13); that the foreman did not address Elmore until Complainant pointed out that she was the only one being ordered to stop (R-2, ¶14); that Respondent treated Complainant unequally with regard to the disciplinary action taken for the incident which was alleged to be discriminatory due to the Complainant's female gender (R-2, ¶19); and that if the Respondent had adequately addressed the previous conflict reported to internal Security in August 1990 through March, 1991, by granting Complainant's transfer request, this situation would not have occurred (R-2, ¶20).

The Respondent also alleges four (4) Special Defenses (R-2). The First Special Defense alleges that the Commission lacks subject matter jurisdiction over Complainant's claim. The Second Special Defense alleges that the Complainant has failed to state a claim upon which relief may be granted. The Third Special Defense alleges that, without conceding that Complainant has suffered any damages as a result of any purportedly wrongful act of the Respondent, the Complainant has failed to mitigate her damages. The Fourth Special Defense alleges that to the extent that Complainant's claim alleges sexual harassment, such claims are barred because the alleged acts complained of occurred more than 180 days prior to the filing of the Complaint.

## III. LEGAL STANDARDS:

### A. Burden and Standard of Proof:

The burden of proof as to the alleged discriminatory employment practices of the Respondent rests with the Complainant. The matter is controlled by the rules enunciated in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). In that case, the Supreme Court established standards and burdens of proof where a complainant's allegation of discrimination is based only on evidence of disparate treatment, but not on direct evidence of discrimination. In a McDonnell Douglas situation, the Complainant has the initial burden of presenting a *prima facie* case sufficient to allow the inference to be drawn that unlawful discrimination occurred. If the Complainant is successful, the burden then shifts to the Respondent, but it is merely to articulate a legitimate, non-discriminatory reason for its action. Then the burden shifts again, back to the Complainant, to prove by a preponderance of the evidence that the reason given by the Respondent was false or "pretextual." In a McDonnell Douglas disparate treatment case, therefore, the Complainant has the burden of persuasion throughout the proceedings. This rule applies to employment and other discrimination proceedings conducted by the commission in this state. Miko v. Commission on

Human Rights and Opportunities, 220 Conn. 192, 203-204 (1991). To establish a claim of discriminatory discharge, such as here, the Complainant must demonstrate by a preponderance of the evidence that she "(1) was a member of a protected class; (2) was qualified for the position; (3) was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination." DiCola v. SwissRe Holding (North America), Inc., 996 F.2d 30, 32 (2d Cir. 1993); See also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); and Ann Howard's Apricots Restaurant v. CHRO, 237 Conn. 209, 225-26 (1996).

The burden of proof on Respondent's four Special Defenses lies with the Respondent. Dubose v. Carabetta, 161 Conn. 254, 262 (1971).

With respect to the standard of proof, Connecticut General Statutes §46a-95(h) provides that "the findings of the presiding officer as to facts, if supported by substantial and competent evidence, shall be conclusive." "Substantial and competent evidence is that which carries conviction. It is such evidence as a reasonable mind might accept as adequate to support a conclusion. It is something more than a mere scintilla and must do more than create a suspicion of the existence of the fact to be established." Corey v. Avco-Lycoming Division, 163 Conn. 309, 322, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 903, 34 L.Ed.2d 699 (1973); see International Brotherhood of Electrical Workers v. Commission on Civil Rights, 140 Conn. 537, 543-44, 102 A.2d 366 (1953). The substantial evidence standard is satisfied if the record provides a "substantial basis of facts from which the facts in issue can be reasonably inferred...." Lawrence v. Kozlowski, 176 Conn. 705, 713, cert. denied, 431 U.S. 969 (1977).

B.  **Evidentiary Standards:**

So long as evidence is reliable and probative it may be introduced at an administrative hearing. Lawrence v. Kozlowski, 171 Conn. 705, 710 (1976). "In contested cases ... [a]ny oral or documentary evidence may be received, but the agency shall, as a matter of policy, provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence ..." Conn. Gen. Stat. § 4-178.[5] "It

---

[5] § 4-178. Contested cases. Evidence

In contested cases: (1) Any oral or documentary evidence may be received, but the agency shall, as a matter of policy, provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence; (2) agencies shall give effect to the rules of privilege recognized by law; (3) when a hearing will be expedited and the interests of the parties will not be prejudiced substantially, any part of the evidence may be received in written form; (4) documentary evidence may be received in the form of copies or excerpts, if the original is not readily available, and upon request, parties and the agency conducting the proceeding shall be given an opportunity to compare the copy with the original; (5) a party and such agency may conduct cross-examinations required for a full and true disclosure of the facts; (6) notice may be taken of judicially cognizable facts and of generally recognized technical or scientific facts within the agency's specialized knowledge; (7) parties shall be notified in a timely manner of any material noticed, including any agency memoranda or data, and they shall be afforded an opportunity to contest the material so noticed; and (8) the agency's experience, technical competence and specialized knowledge may be used in the evaluation of the evidence.

is well established that, even at the hearing stage of adjudicative proceedings by agencies, hearsay is admissible ..." Adriani v. Commission on Human Rights & Opportunities, 220 Conn. 307, 319 n. 11. (1991). "The erroneous admission [or omission] of evidence will not invalidate an administrative order unless substantial prejudice is affirmatively shown .... Connecticut Natural Gas Corporation v. PUCA, 183 Conn. 128, 139, 439 A.2d 282 (1981); Balch Pontiac-Buick, Inc. v. Commission of Motor Vehicles, 165 Conn. 559, 570, 345 A.2d 520 (1973)." Griffin v. Muzio, 10 Conn. App. 90, 94, 521 A.2d 607 (1987).

With respect to witnesses, "[i]t is the hearing officer's prerogative to assess the credibility of the witnesses and believe or disbelieve any evidence presented." (Citation omitted.) Levy v. CHRO, 35 Conn. App. 474, 489, 646 A.2d 893 (1994); Miko v. Commission on Human Rights & Opportunities, 220 Conn. 192, 200-201, 596 A.2d 396 (1991). The hearing officer may believe or disbelieve the testimony and evidence presented by any witness ..." Briggs v. State Employees Retirement Commissions, 210 Conn. 214, 217. The weight to be given to evidence and the inferences to be drawn from the evidence are all matters for the trier of fact. SFP Tisca v. Robin Hill Farm, Inc., 244 Conn. 721, 731, 711 A.2d 1175 (1998); Goodrich v. Diodato, 48 Conn.App. 436, 442, 710 A.2d 818 (1998); Suarez-Negrete v. Trotta, 47 Conn. App. 517, 520, 705 A.2d 215 (1998). In making factual findings, "[t]he trier is not limited to arbitrating the differing opinions of the witnesses but is to make determinations in the light of all the circumstances and the evidence...." Filipetti v. Filipetti, 2 Conn. App. 456, 458-59, 479 A.2d 1229, cert. denied, 194 Conn. 804, 482 A.2d 709 (1984). The trier of fact "has the advantage of hearing a recital of the transaction between the parties from the mouths of the persons concerned and the opportunity of evaluating their credibility. As the trier, it is the sole arbiter of the credibility of witnesses and is privileged to adopt whatever testimony it reasonably believes to be credible. Faiola v. Faiola, 156 Conn. 12, 15, 238 A.2d 405; Grote v. A. C. Hine Co., 148 Conn. 283, 287, 170 A.2d 138; Metz v. Hvass Construction Co., 144 Conn. 535, 537, 135 A.2d 363." Tartaro v. La Conte, 157 Conn. 583, 254 A.2d 912 (1969). Potential bias, prejudice, interest, or lack of interest in the case, are factors to be considered by the trier of fact in its assessment of the [credibility of the] testimony of any witness. See Rogers v. Delfino, 13 Conn. App. 725, 539 A.2d 156 (1988). Bias may consist of a friendly feeling or of hostility. It may be shown in a variety of ways. The bias or prejudice of a witness may properly be shown either by cross-examination or by testimony of other witnesses. Fairbanks v. State, 143 Conn. 653, 657, 124 A.2d 893; see Fordiani's Petition, 99 Conn. 551, 560, 121 A. 796. In addition, implied bias may be shown by the relationship of a witness to a party. 3A Wigmore, Evidence (Chadbourn Rev.) § 949.

"Even where the administrative record contains uncontradicted testimony as to the existence of a given fact, the [Presiding Officer's] failure to find that fact must be understood as a discretionary decision not to believe or accept the testimony of the witness instead of an abuse of its sound discretion." Fenn Mfg. Co. v. CHRO, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 509435 (February 8, 1994, Sheldon, J.), at 39, affirmed 232 Conn. 117 (1995). Moreover, if the evidence before an administrative hearing officer would warrant either of two opposed findings, it is irrelevant that there is evidence to support a finding contrary to the finding made by the hearing officer. See 2 Am. Jur. 2d, §543, Administrative Law. When the trier of fact's

finding is based on the decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. Anderson v Bessemer City, 470 US 564, 84 L Ed 2d 518, 105 S Ct 1504.

### C. Damages:

The Connecticut Supreme Court, in construing Connecticut General Statutes §46a-86, has held that a hearing officer who finds that an employer has discriminated against an individual is obligated to "render a decree which will, so far as possible, eliminate the discriminatory effects of the past as well as bar like discrimination in the future." (Citations omitted; internal quotation marks omitted.) Civil Service Commission v. CHRO, 195 Conn. 226, 231, 487 A.2d 201 (1985). A victim of unlawful employment discrimination may be entitled to monetary relief to restore her to her "rightful economic status absent the effects of the unlawful discrimination." State v. CHRO, 211 Conn. 464, 484 (1989). In calculating such relief, the hearing officer is required to reduce the amount of the back pay award by the amount that the claimant could earn, or has earned, using reasonable mitigation efforts. Conn. Gen. Stat. §46a-86(b); see also Cassino v. Reichhold Chemicals, Inc., 817 F.2d 1338, 1346-47 (9th Cir. 1987), cert. denied, 484 U.S. 1047, 108 S. Ct. 785, 98 L.Ed.2d 870 (1988). However, if, upon all the evidence and after a complete hearing, the hearing officer finds no discriminatory acts on the part of the Respondent, he is bound to dismiss the Complaint. Conn. Gen. Stat. §46a-86(c).

### III. FINDINGS OF FACT:

Pursuant to Conn. Gen. Stat. §4-180(c), all findings of fact are based exclusively on the evidence in the record and on matters noticed by the trier of fact. The parties testified at length, so that the undersigned had ample opportunity to assess their credibility. Based on the testimony heard, the undersigned's evaluation of the credibility of the parties and the other witnesses and the exhibits that were introduced, the following facts are found:

#### A. Subordinate Factual Findings Pertinent To The Complaint

The Complainant was a resident of Woodstock Connecticut and resided at 248 Bungay Hill Road, between 1992 and 1998. (Tr.19 and Ex. R-1).

The Respondent has its business address as 400 Main Street, East Hartford, CT 06118. (Ex. R-1)

Complainant graduated from High School in June 1973. She spent 2 months, in California, working with a carpenter to learn cabinet making. She then returned to Connecticut and searched for employment. (Tr. 20, Comm. Exh. A.)

Respondent hired Complainant in November 1973 as an Engine Lathe Operator in Labor Grade 8. (Tr. at 23-24, Comm. Exhs. A and B.)

Complainant worked at the Respondent's facility in East Hartford. (Tr.21-22).

Complainant worked as an Engine Lathe Operator until February 23, 1976, when she took and completed a 22-week apprenticeship course in Basic All-Around Machinists' Course. To become eligible for this training, she took adult education courses in algebra and geometry. After graduating from this course she was promoted to Labor Grade 7. (Tr. at 24-26, Comm. Ex. B.)

Complainant worked in the Lathe Machine Operator Labor Grade 7 for about a year and a half. She was then was assigned to take a two year class (apprenticeship) in Master Mechanics Tool, Dye and Gauge. After she completed the course in or about 1979, she was transferred into Master Mechanics Inspection, Department 37, into the position of Tool Inspector C, Labor Grade 6. (Tr. 26-29.)

In 1981, Complainant's supervisor, Gary Wheelock, recommended her for a promotion and raise to Tool Inspector B, Labor Grade 4. (Tr. at 29-37, Comm. Exh. D).

In 1981, Complainant was the only woman in the Tool Inspector C, Labor Grade 6 position and the only woman promoted to the Tool Inspector B, Labor Grade 4 position. (Tr.32-33, 37).

In March 1984, Master Machinists Inspection, Department 37, was changed to Quality Assurance, Department 981. (Tr.38, Comm. Ex. L-M.)

In or around 1984, there were 16 Tool Inspectors B, Labor Grade 4. (Tr. 38.)

Supervisor Gary Wheelock had been replaced by Ronnie Carr, so that in 1984, Ronnie Carr was the Supervisor. (Tr.41).

In 1984, pursuant to the terms of its collective bargaining agreement with the employees' union, the Respondent posted a list of employees identifying their occupational codes (which identified position and labor grade), for purposes of identifying employee eligibility for overtime. The lists were referred to as the "overtime sheets" and "overtime charts". (Tr. 30, 32, 42.)

## Promotions

In the early 80's, Inspector Promotions to the next labor grade were usually made in groups. (Tr. 643.)

In or about 1984 and 1985, there were two group promotions in which male Inspectors Labor Grade 4 were promoted to Inspector Labor Grade 2. (Tr. 38-43).

Eight Inspectors were promoted in 1984. (Tr.38-39)

Five Inspectors were promoted in 1985. (Tr.38-40) The three inspectors, who were not