promoted in 1985, included Complainant (female), Elmore (African American male) and Jason Rupold (male absent on disability leave related to workers' compensation). (Tr. 39-41, 641-642.)

In 1985, after the second group of Inspector promotions, Complainant saw the Overtime chart that showed Elmore's occupational code had been changed to reflect that he too, had been promoted. (Tr. 43.)

Elmore had filed a grievance against the company, through the union, to get his promotion to Labor Grade 2. (Tr. 755-756.)

Pursuant to the Union Agreement, employees were to be promoted based upon their seniority, fitness and ability. (Tr. 695.)

Prior to the group promotions, Complainant showed that she had requisite fitness and ability. Her work performance evaluations had indicated that she was fully competent or exceeded expectations. (Comm. Ex. C).

The hourly employees came to know of each other employee's level of seniority based upon lists of Respondent employee information, reflecting seniority dates, which they informally circulated. (Tr. 48-54). An example of one such list which was circulated, was dated 1988. (Ex. Q.) The hourly employees circulated this information because they were concerned about layoffs (which were based upon seniority). (Tr. 48.)

Rupold, Elmore and Complainant had approximately the same amount of seniority, in that they were all hired between October and November 1973. Elmore was hired first, Rupold was hired next, and Complainant was hired last. (Tr. 55, Ex. Q). Complainant had sufficient seniority and training to have been promoted with the other labor grade 4 inspectors, who were promoted to Labor Grade 2. (Tr. 689.) In 1985 after Elmore had been promoted, Complainant was the only Department 981 Inspector Labor Grade 4 working in the department that had not been promoted to Inspector Labor Grade 2. (Tr. 42-43). Complainant asked her Supervisor, Ronnie Carr ("Carr"), about her promotion. (Tr. 43). Supervisor Carr suggested that she leave his department and go to the "Development Operations" area. Complainant understood his suggestion to mean that Carr did not want her to work in his department, Dept. 981. (Tr. 43-44).

Complainant asked Carr how she could become eligible to be promoted to Inspector Labor Grade 2. Supervisor Carr told Complainant that she would have to learn and become knowledgeable about everything - all facets of inspection, before she could get the top labor grade in the department, Labor Grade 2. (Tr. 44-45.)

In 1985, no Inspector in the Quality Assurance Department was knowledgeable about every facet in inspection. (Tr. 55-56). Today, no Inspector is knowledgeable about every facet in inspection. (Tr. 56.)

11

### Supervisor Parent

Shortly after Complainant's meeting with Supervisor Carr, she was transferred to work in the Metrology Lab under the supervision of Kent Parent ("Parent"). (Tr. 56). When she began working in the Metrology Lab, she did not receive any training. Complainant asked Parent about receiving training. She told him that the objective of her being in the Metrology Lab was to become eligible for promotion to Inspector Labor Grade 2. (Tr. 57.) Supervisor Parent was unresponsive. (Tr. 57.) In May 1986, Complainant then grieved her need for training opportunities through the union. (Tr. 57, Comm. Ex. QQ.) The result of the grievance was that Complainant was to be rotated for further training. (Comm. Ex. QQ). Supervisor Parent then assigned her to learn how to work on antique and obsolete guillotine gauges. The Respondent was phasing out the use of the guillotine gauges which require a mechanical physical form of measurement of contours of blades. Newer methods of measurement were being utilized by the Respondent and Respondent was replacing guillotine gauges with computerized measuring machines. (Tr. 57-58, 168-169).

Supervisor Parent did not provide any other training opportunities to Complainant while she was in the Metrology Lab. (Tr. 57-59). In January 1988, Complainant filed a D.G.V.O. to request training on computerized measuring machines in the Cold Room. (Tr. 59-60, Comm. Ex. E). Don Martin ("Martin"), the then current head of the department, reassigned Complainant to the Computer Room.

In February 1987, during Complainant's assignment to the Metrology Lab under the supervision of Parent, Complainant came to understand that Parent was building a case to support her termination. (Tr. 61-70). Parent gave Complainant a verbal warning. (Tr. 60-61). Complainant called her Union Steward to grieve the verbal warning. The Steward reviewed her Personnel File and discovered that Parent had made a number of entries on a form called the "Employee's Remarks Record". The Steward informed Complainant of the Employee's Remarks Record and advised her that "this form was a tool that the company used to terminate people that accumulates adverse remarks" (Tr. 61, Comm. Ex. NN). Complainant did not know of the existence of the form before. (Tr. 61-62, Comm. Exh. NN).

Complainant grieved the 2/4/87 verbal warning and she also grieved an earlier entry of 2/23/86 which Parent had made on her Employee Remarks Record. The result of her grievances were that Parent's 4/23/86 entry was to have been removed within several days of the grievance decision, and the 2/4/87 verbal warning was to be removed in 6 months. (Tr .62-63). Six months after the verbal warning grievance decision, Parent did not remove the verbal warning entry from Complainant's Employee's Remarks Record; instead, he added a positive remark on 7/10/87. Complainant then grieved to have the verbal warning removed from the Employee's Remarks Record. The grievance decision ordered that the verbal warning be removed from Complainant's Employee's Remarks Record. Joseph Burns ("Burns") removed the verbal warning on August 26, 1988. (Tr. 60-65, Comm. Ex. NN).

Parent gave Complainant an oral warning on 1/27/88. (Comm. Ex. NN)

12

In or about January 1988, Complainant was transferred to the Cold Room under the Supervision of Burns. (Tr. 66). Although Complainant had been moved out of Parent's supervision and was then under the Supervision of Burns, Parent gave her three additional negative employment reports "Employee's Memorandums" ("E/Ms"), as reflected on her Employee's Remarks (Record, Tr. 60-65, 91, Comm. Ex. NN).

Parent gave Complainant an E/M on June 28, 1988 noted 7/15/88 for misuse of work and time and disrespectful behavior. Supv. Parent signed Complainant Employee's Remarks Record to indicate that the E/M was jointly given by Burns and himself, although it was only Supv. Parent who gave the report. Complainant contacted her Union Steward to grieve the E/M and then discovered that Supv. Parent had not removed the 2/4/87 verbal warning pursuant to the order of the prior grievance decision. Complainant then also grieved to have the verbal warning removed from her Employee's Remarks Record. The grievance decision ordered that the 2/4/87 verbal warning and the E/M be removed from Complainant's Employee's Remarks Record. Burns removed the verbal warning and the E/M on August 26, 1988. (Tr. 65-68, Comm. Ex. NN).

By her letter to Burns dated 7/18/88, Complainant also complained to the Respondent that she was being harassed and discriminated against by Parent, Carr and Personnel Advisor Steve Crane ("Crane") in two ways: (1) by the continuing efforts of Parent to accumulate negative remarks in her record, for purposes of justifying her termination; and (2) by the Department's upper management's failure to promote her into Labor Grade 2. By 1988, she had been working in Labor Grade 4 for 7 years. Also by 1988, she was doing the same work as a Labor Grade 2 but she continued to be employed in a Labor Grade 4. She claimed that she was being discriminated against because she was a woman. (Tr. 162-164, Comm. Ex. N).

Complainant complained that negative entries were being made on her Employee's Remarks Record, without her knowledge. On September 15, 1988, Parent responded by telling Complainant that he was giving her two E/Ms on September 15, 1988 noted 9/29/88. The two E/Ms appeared to split and restate the 7/5/88 E/M for misuse of work and time and disrespectful behavior. Although Parent wrote up Complainant for the two E/Ms, the notation on Complainant's Employee's Remarks Record indicate the sign-off by Burns and Deforge. Supv. Burns actually presented her with the E/Ms, and Complainant refused to sign the same. Burns then asked a salaried employee to witness the presentation of the E/Ms to Complainant. Burns' name and the salaried employee's name are indicated in Complainant's Employee's Remarks Record. Complainant contacted her Union Steward to grieve the 9/15/88 E/Ms. The grievance decision ordered that the 9/15/88 E/Ms be removed from Complainant's Employee's Remarks Record. Burns removed the E/Ms on January 3, 1989. (Tr. 68-70, 76-77, Comm. Ex. NN.)

After receiving Parent's two 9/15/88 E/Ms (later noted in her Employee's Remarks Record on 9/29/88), Complainant submitted to Burns a written response to Parent's 9/15/88 E/M entries dated 9-26-88, for insertion into her Employee's Remarks Record. (Comm. Ex. O). Complainant claimed in this response that Parent was continuing his efforts to cumulate adverse remarks in her Employee's Remarks Record by his failure to remove the 2/4/87 Verbal Warning when required and

13

by his issuance of the two 9/15/88 E/Ms which reissued and split the 6/28/88 E/M (noted in the Employee Remarks Record on 7/5/88) within about two weeks of the grievance decision ordering the removal of the 7/5/88 Employee's Remarks Record entry. She complained that she was being retaliated against. She also complained that Burns was allowing this to happen. (Tr. 162-164, Comm. Ex. O).

After receiving Parent's two 9/15/88 E/Ms, Complainant, feeling that she had to take further action to stop the harassment, called the Contract Compliance Office (United States Office of Federal Contract Compliance Programs (OFCCP)) in Boston, to complain about the harassment that she was experiencing from the Respondent. She was told that other women who experienced the harassment had to be identified and included. She then worked with her Union to send letters out to invite other female inspectors in Department 981. The letters asked female members who were suffering from gender harassment to identify themselves. Complainant received some responses from other women working for the Respondent. (Tr. 70-75, Comm. Ex. R.)

### The Computer Room

In 1988, Complainant asked Burns about the possibility of a promotion to Labor Grade 2. When not promoted, she submitted to Burns and to Department Head Martin (hereinafter "Martin"), a D.G.V.O requesting the promotion to Inspector Labor Grade 2. (Tr.78, Comm. Exhs.G, I).

In 1988, Complainant started working on the old equipment in the Computer Room. She wanted to expand her knowledge to all facets of inspection, by seeking training on the 'DIA' computerized measuring machines in the cold room. She frequently asked her supervisor, Burns, for training on the DIA. When he did not provide it to her, she submitted DGOVs to Burns and then to department head Martin to request training on the DIA machines. (Tr. 78-89, Comm. Ex. F, H.) After many requests were made, in 1990 Complainant was assigned to be trained and to work on the DIA machines. Prior to her assignment to the DIA machines, Burns told her he would not assign her to the machines because she was too large and awkward to do that kind of thing, and that she would break the machine. (Tr. 91, 168-169).

In 1988-1992, the staffing of Department 981 was primarily male. (Tr. 615-616). Richard McCusker ("McCusker") spoke with several inspectors in Department 981, including Bill Manville ("Manville") and "Crazy Dick", who told him that they felt the 981 area was a "male area", and they did not like the fact that women were getting jobs in the area. Women tended to be delegated to different areas, e.g. gauge areas and cutter grind areas. There were not many men who had jobs, like setting up gauges, inasmuch as the males felt it was demeaning work. (Tr. 620-624.)

Burns treated the females he worked with differently than the males. Burns engaged in casual conversation most frequenly with the men in the department and did not speak casually to the women unless he was telling them something about the work they were doing or unless they initiated the conversation. (Tr. 325-327.) Sandra Irving ("Irving") could not remember having conversations with Burns; she only remembered that she did not have any problems with him. Carolyn Sprague

14

("Sprague"), a female inspector, remembered that Burns was distant to her but would readily initiate discussions with the men in her area. (Tr. 325-327, 338, 490.)

Burns assigned work to female employees, but he did not discuss the work with them, even when work problems were brought to his attention. Burns assigned Sprague, whom he supervised, to train a new male employee on the DIA Bravel machine. Sprague's co-worker heard the new employee complain to Burns that she was not training him. Burns never followed up on the new employee's complaints. The new employee was making similar complaints to others in the work unit. The men in Sprague's unit finally sat down with Burns to tell him that the new employee did not show up for training. Burns had not otherwise followed up regarding Sprague's training. (Tr. 326-329). On another occasion, Sprague was working and the Production Department asked that she stay late to provide inspection assistance. On the following Monday, Burns chastised her for staying late. She had never known him to be upset when a male employee was asked to stay late. (Tr.330-333). Burns' attitude towards women was typical at Pratt, it was a male atmosphere. (Tr.334.) Sprague felt that Burns might have thought that women should not be working at Pratt, but Sprague did not think he would actually say that. (Tr.338).

Burns disregarded Complainant's complaints that she was being treated differently because she was a female. Burns did not view them as complaints of discrimination on the basis of gender. (Tr. 529-531. Comm. Exhs. N, O.)

Burns saw dirty jokes and lewd pictures circulate around the Department 981 shop floor. His "lead man", Jim Humphrey ("Humphrey") and Robert Casaboom ("Casaboom") showed him lewd jokes and pictures with lewd connotations. (Tr. 536-541). Casaboom had a collection of lewd jokes and cartoons. They could have been out of a Playboy Magazine or a Hustler Magazine or whatever was floating around the shop. (Tr. 685-686). Most males at Pratt had a standard practice of circulating the lewd jokes and cartoons amongst themselves. (Tr. 687.)

### Benny Elmore

Complainant first met Elmore in 1979, after she graduated from the two year apprenticeship program and first came into the Department. She got along with him then. (Tr. 91-92.) Complainant worked in the same area as Elmore when she was assigned to work with Burns in 1988. (Tr. 91-92.) Complainant first had a problem with Elmore in 1990 with Elmore when came into the Cold Room to talk with Roberto Torres ("Torres") and Frank Lamana ("Lamana"). He did not have a work-related reason to be in the Cold Room. He was there to socialize. She did not want to be near Elmore, he made her feel uncomfortable, because he had developed a meanness toward her. She thought that he would direct a fresh comment to her. Complainant left the cold room and went to speak to Burns, who was at a table just outside of the Cold Room door. Elmore, Torres and Lamana came out of the Cold Room while Complainant was waiting to speak with Burns. As they came out, Complainant looked at them and Elmore waived the middle fingers of both of his hands at Complainant, gesturing one finger into the other hand. Complainant told Elmore to "Stop it, that's disgusting." Burns asked what was going on and Complainant repeated Elmore's gesture to Burns.

15

Elmore said "no, no, no" and then he repeated his gestures to Burns. Burns leaned over the three to four foot wall which surrounded two desks to make his office (the "bullpen") and picked up his phone and appeared to speak into it. (Tr. 298, 349.) Complainant did not see Burns dial a phone number prior to lifting the phone and speaking into it. (Tr. 94-98). Burns took no further action in connection with this incident. (Tr. 98.)

About a month after the aforementioned incident, Complainant had another problem with Elmore when he again came into the Cold Room to talk with Torres and Lamana. Elmore came in and sat by a DIA near to where Torres was working. Elmore did not have a work-related reason to be in the Cold Room. He was there to socialize. Complainant did not want to be near Elmore, so she got up to leave the room to find Burns. She had to walk by where he was sitting to leave the Cold Room and as she passed him, he looked her in the straight in the eye and said that he had a "big one". Complainant understood Elmore to be referring to part his male genitalia. (Tr. 110-112). Complainant then left the room and found Burns. She reported what happened and told Burns that she did not appreciate that kind of conduct and that she wanted to complain further. Burns made an appointment with Personnel for Complainant. Complainant went to Personnel the next day, and spoke to Cathy Montoya ("Montoya"). Complainant told Montoya about this incident and the first incident with Elmore (Tr. 112-113.) Complainant asked Montoya what she should do. Montoya told her that she should go to I.S.I.D (Internal Security) if anything further happened. Montoya took not report or statement from Complainant. (Tr. 113-114).

About a month after the foregoing incident, Complainant had another problem with Elmore. This occurred on a Saturday. Complainant was having a problem with a part she was working on. She needed to talk to the "Lead Man", Humphrey. She looked out the window near her machine and saw Humphrey socializing with Elmore and another inspector, Ron Nightengale ("Nightengale"). Complainant came out of the Cold Room to talk with Humphrey about the part. When Humphrey saw Complainant coming toward him, he got up from the chair he was sitting in and walked toward her. When they met, Humphrey was facing Complainant with his back to Elmore and Nightengale.

Complainant was facing Humphrey. Elmore and Nightengale were visible behind Humphrey. Complainant handed the part to Humphrey and told him the problem. As he studied it, Complainant looked up. Elmore made direct eye contact with her, pulled his pants from his waist and stuck his hand down his pants to his elbow. Complainant then looked away. Then Elmore and Nightengale giggled. Nightengale walked away toward a sink on the side of the room. Elmore then yelled over to Nightengale "I have a big one for you." At this point Humphrey started to walk to the Cold Room. Complainant followed him into the Cold Room, and she asked him if he had heard what Elmore had just said. He stated that he did not hear anything. Complainant then told Humphrey what happened with Elmore's hand in the pants gesture. (Tr. 114-122.)

On the Monday following the aforementioned Saturday incident, Complainant reported the incident to Burns. Burns then sent her to I.S.I.D. Complainant gave a statement about the incident, dated October 4, 1990, to I.S.I.D Investigator Dauberthauser. (Tr. 121-122, Comm. Ex. S.) By

16

Complainant's Statement's reference to the prior incidents with Elmore, she meant that the incidents had already been brought to the attention of Personnel. (Tr. 281-283.) Investigator Dauberthauser did not give any instruction to Complainant. She returned to her work location. When she arrived at her work location, she found a vulgar cartoon on her toolbox. The cartoon pictured male genitalia on legs chasing female genitalia on legs with the caption of "One f---in' thing after another." (Tr. 123-124). She then took the cartoon out to show to Burns. Complainant then attempted to bring the cartoon to Investigator Dauberthauser at I.S.I.D., but he was not there. Complainant finally brought the cartoon to Montoya in Personnel. Montoya knew that Complainant had been to I.S.I.D. She agreed with Complainant that the cartoon was fresh, and then Montoya took the cartoon. Complainant had not made a copy of the cartoon and she never received it back from Personnel. (Tr. 124-125.)

Prior to the cartoon incident above referenced, male employees often circulated or otherwise shared pornographic pictures and cartoons with each other in the workplace. One of the inspectors in Department 981 was known to have a large collection of pornographic cartoons and pictures in his tool box at his work station. Pornographic materials were also shared with Burns in the workplace. In the Cold Room, an employee from a shift other than the second shift had a poster of a naked woman painted with Zebra stripes hanging on the walls. After the foregoing incidents, Complainant realized that the difficulty that she was having with Elmore was common knowledge. (Tr. 126.) She then decided that it would be better to transfer out of the work area or out of the department altogether. She asked Burns for a transfer to a different work location in the same department. He did not give her a transfer. She asked for a transfer to a different department. She submitted a D.G.V.O. on 10/15/90 to seek a transfer to a different department. (Comm. Ex. J.) She was not transferred. She never received a response to her transfer requests. (Tr. 125-30.) She was later told by Burns that she could get a transfer into Development Operations if she would take a demotion to Labor Grade 5. She rejected the demotion to Labor Grade 5. (Tr. 392-394). There were other work locations in Dept. 981, which Burns supervised, to which he could have transferred Complainant. (Tr. 577-580). Burns did not transfer Complainant to any of those locations.

I.S.I.D. Investigator J. Dauberthauser investigated the incident and issued a report on Elmore, dated October 19, 1990. (Comm. Ex. T.)

Complainant frequently heard Elmore make comments about her body. She heard him make them when there were tasks that she had to perform which required bending over to pick something up. He would make comments about her rear end. He also made comments about how large Complainant's back was and about the type of bra she wore. Elmore stated that it was the wrong kind of bra because it allowed her breasts to fall out when she bent over. (Tr. 166-167.)

Complainant avoided all contact with Elmore after this occurred. (Tr. 175.)

It was known by Burns and other Respondent employees that Complainant and Elmore did not like each other and did no get along with each other. (Tr. 350, 404-407, 470, Comm. Exhs. FF, GG.)

17

On November 9, 1990, Complainant met with Al Pollard ("Pollard") of Personnel. He told her "its over." (Tr.248-250.) At some point following the Complainant's filing of her I.S.I.D. complaint, Burns gathered the staff of Department 981 together to tell them about the company's policy against pornographic cartoons and pictures. He also told them not to discriminate or harass. He used the example of religion. You should not pick on someone because of their religion. (Tr. 235-236.) The meeting was brief and it was held without prior notice of its scheduling in the Cold Room. At the time the meeting was being held, Complainant, who was unaware of the a meeting, was in the lavatory. The meeting had concluded by the time she returned to her work station. Complainant learned of the meeting afterward, when she returned to the Cold Room. (Tr. 234-235.)

All jobs were affected by the Respondent's "job design". In June 17, 1991, Complainant's position was changed to a Labor Grade 2 through job design. (Tr. 666.) However, there were other higher level inspector positions made at the same time. The Labor Grade 4s who were promoted to Labor Grade 2 in the 1980s, before Complainant, were promoted to Labor Grade 1 as a result of job design. (Tr. 666-667.)

### B. Factual Findings Pertinent To Propriety Of Termination

#### The Location of The Time Clock

In 1990-92, the Department 981 time clock was located in a central location in the production floor of the department. It was situated in front of a floor to ceiling support beam. It was about 3 ½ to 4 feet from the floor or at about the rib level of Complainant, and slightly lower for Elmore. In front of the time clock there was a keyboard to enter information about the particular job. To the left and to the right of the time clock there were racks against the wall which held cards or paperwork identifying the particular jobs the employees were working on. (Tr. 205). Adjacent and to the left of the card rack and to the right of the time clock there were tall cabinets, approximately 4 feet high. (Tr.223, 800, Comm. Ex.PP).

In front of the time clock there was an open floor space. In front of the time clock, the open space was bordered to the left by a row of the Inspector's surface plate inspection work stations. The open space on the far side was bordered by a couple of surface plates and some other types of Inspection related work stations. To the right of the time clock there was open space going out to a large aisle running through the building. To the right rear of the time clock there were tool cabinets, surface plate work locations. Burns' office (the "bullpen") was about 34 feet from the time clock, and it was located to the right of the time clock but behind the cabinet to the right of the time clock. (Comm. Ex. PP).

Behind the time clock there were rows of tool boxes and cabinets holding other tools and equipment and supplies. The Cold Room was an enclosed room located to the left against the back wall behind the time clock. (Tr. 98-105, 140, 792-801, Comm. Ex. PP).

#### The Time Clock and End of Shift Procedure

18

There was a procedure followed at the end of the second shift. Fifteen minutes before the hour which was the end of the shift, the hourly employees clocked in their work at the time clock. The employee would bring their identification card (a/k/a "badge") and would either bring paperwork, identifying the particular job they were working on, from their work station or would pick up identifying paperwork from the card racks to the left or to the right of the time clock. (Tr. 132-133, 286-288, 293, 354-355, Comm. Ex. RR.)

To clock out his or her work the employee would be holding the job card or paperwork with the bar code and the badge. First, the employee would press the "Enter" button. Second, the employee would swipe his or her badge card down through a vertical card swipe slot located on the right side of the time clock, likely with the right hand. Third, the employee would pick up the wand and run it across the job information bar code, which would identify the job the employee had worked on up to that time. (Tr. 134-135, 286-288, 293, 715, Comm. Exh RR).

After clocking out his or her work, the employee would return to the work station area, clean up the work space and prepare to leave work. (Tr. 293). At the hour ending the shift, the employee would go to the time clock, for purposes of attendance and swipe his or her badge down through a vertical card swipe slot located on the right side of the time clock, likely with the right hand, and the employee would then leave work. (Tr. 132-135, Comm Ex. RR).

In Department 981 in the second shift, about 20 people punched out work and attendance using the time clock. People developed routines with regard to the attendance punch out, the last punch out of the evening. For the attendance punch out, Complainant would usually arrive at the time clock first and wait there until midnight. Sandra Irving ("Irving") would usually arrive second and so on. Routines were not applicable to the work punch out. The order in which the employees arrived at the time clock depended upon on the job each employee was working on. There was no routine in employees' arrival at the clock to punch out work. (Tr. 279-280.)

### The Incident of July 27, 1992

On July 27, 1992, an incident occurred between Complainant and Elmore in front of the Department 981 time clock at the end of the second shift. (Tr. 134). At 11:45 p.m. on July 27, 1992, Complainant left the Cold Room to go to the time clock to punch her work out for the evening. When she arrived at the time clock, Elmore and Richard (a/k/a "Dick") Grous ("Grous"), the lead man (Labor Grade 1), were socializing. (Tr 134-135, 291, 296, 791). Elmore was in front of the card racks to the left of the time clock. Elmore was not looking in the card racks for his job card. Grous was at the time clock trying to clock out his work. Complainant stood in line behind Grous and waited for him to finish. (Tr. 296). Grous was having a hard time clocking out his work because of his divided attention to the clock and the conversation with Elmore. (Tr.134-135). When Grous completed punching out his work, Elmore was still in front of the card racks to the left of the time clock. Grous walked away from the time clock. It was not uncommon when someone was looking for their work information at the card racks for the next person on line to step up and clock out, if they already had the job information. (Tr.797). Complainant saw that Elmore had nothing in his

19

hands. Instead, he was looking in the card racks for his job card. Complainant approached the clock to punch out her work. Complainant stepped up to the time clock and punched the "Enter" button and started to swipe her identification card through the vertical card swipe slot. (Tr 135-136).

When Elmore saw Complainant at the clock, he said "Oh no you don't" and went to the clock. He reached across the front of Complainant and pushed up against her as he pushed Complainant's right hand holding her identification away from the card swipe slot and stopped the punch. Complainant tried to swipe her identification card through again and Elmore continued to push against her, blocked her hand away from the card swipe slot and pressed the "Cancel" button. Elmore continued pushing against her as he continued to continued to press the "Cancel" button towards the lower left corner area of the clock. The "Cancel" button canceled the punch transaction. Elmore continued to press the "Cancel" button with his finger, which prevented Complainant's efforts to punch out. Complainant tried to push Elmore's finger away from the "Cancel" button. As Elmore was pressing the Cancel button with his hand, and Complainant was trying to push his finger away from the Cancel button, Complainant noticed that Elmore had nothing in his hands. He did not put anything on the counter and he did not drop anything. (Tr. 136-137, 288-289).

As Elmore continued to press his body against Complainant to push her away from the clock, and to push himself between her and the clock (Tr. 209), Complainant tried to hold her ground. (Tr. 210). She felt offended and very uncomfortable with Elmore's body pressed up against hers. (Tr. 208). She felt his torso from the waist up to the shoulder against her. (Tr. 137). Elmore was pressing against Complainant's chest. (Tr. 190-192).

In an attempt to have Elmore move away from her person, Complainant yelled very loudly, "Get away you pervert. Get off me you pervert." After Complainant yelled, Elmore stepped back and away and then stepped forward again and re-engaged in the pushing. (Tr. 137). Grous was a few steps away from the time clock and then he heard a commotion and words behind him. He turned and saw Complainant and Elmore in front of the time clock pushing against each other. He heard words being spoken but only made out Complainant saying to Elmore "watch where you're touching". He then went over to Burns in the bullpen and told him about the problem at the time clock. (Tr.297-298, 347). Elmore resumed contact with Complainant. The second time, more of Elmore's body came into contact with the left side of Complainant's body. Complainant felt Elmore's head by her left ear and felt the front of his torso flush against the back and side of her left shoulder down to her knee. She tried to get him off her by yelling again "Get off of me you pervert. Get off you pervert." This time he did not move away. She tried to push him away from her with her elbow, but he still would not move. She then tried to push him away with her leg, by kicking out in back of her. She did not know if she made contact. Elmore yelled very loudly "Stop kicking me." The only reason she used her arm and leg was because she wanted Elmore to be physically off her body. She wanted the contact broken. She was naturally defending herself from the offensive physical contact by Elmore. (Tr. 140-142, 215, 220). Elmore never indicated that she had hurt him or that he was in any way injured. (Tr. 192, 467).

When Grous told Burns about the problem at the time clock, Burns stood up and looked over

20