at the time clock area. He saw Complainant and Elmore both trying to use the time clock at the same time: "a couple of arms [were] going at the time clock together, and you could only ring out one person at a time." He could not see any pushing from where he was. (Tr. 298, 347-350).

By this time Complainant wondered where Burns was. She became aware of some people, who had gathered around and were watching. (Tr. 138). Complainant looked up to Burn's office. She could see full view of where Burns was and realized that he could not see the time clock area full view because of the cabinets blocking the area from the waist down. Complainant then saw Burns coming through his office doorway toward the time clock. Then Elmore said in Complainant's ear "That's right, you call Joe Burns." (Tr. 138-139, 847-848.)

Burns came into the area of the time clock. As he arrived, Elmore broke contact with Complainant and moved towards the right side of the clock near where Complainant had been standing. Complainant moved away from Elmore and went to the left of the clock, near to where Elmore had been standing. (Tr. 139).

Burns testified that after he came into the time clock area, Complainant then tried to punch her work out. When she did this, he saw Elmore hit the cancel button. (Tr. 351-352.) Both Complainant and Elmore testified that neither Complainant nor Elmore tried to punch out their work as Burns was entering the time clock area or after Burns entered the time clock area. (Tr. 731-732, 830-832.)

Burns then stood right in front of the clock. Burns directed his comments to Complainant, saying "Stop it, its not worth loosing your job over. You're acting like kids." When Complainant realized that Burns was directing all of his comments at her, she asked him "Why are you saying this only to me? There are two of us here." He then moved back and included Elmore in the conversation. (Tr. 139-140). He then directed Complainant and Elmore to the bullpen to wait for him. (Tr. 141-142, 351-352).

Burns testified that he was bumped by Complainant as he got in between her and Elmore. Burns could not recall if he was bumped by Elmore. (Tr.354-355). Complainant testified that she did not bump into Burns as they were walking over to the bullpen area from the time clock area. (Tr.830-832). Elmore sat at a surface plate just outside the entrance to Burns' office. Complainant sat at Burns' desk inside the bullpen. Burns got on the telephone and then he told Complainant to punch out. Then he told Elmore to punch out. (Tr 142-143, 354).

The same evening, Burns wrote a letter to notify his Quality Manager, Martin Berr ("Berr"), of the incident, and he called the Personnel Advisors to discuss the incident and what he should do.

The next day, Burns notified I.S.I.D., before he discussed the matter with Berr. (Tr. 356-357). Complainant was transferred to a different work area in Department 981 at the beginning of the next work day. She was transferred to Vanes and Shrouds. This was located in the I1 Building. (Tr. 144-145, 361-362). Complainant testified that she still reported to Burns after the transfer. She

21

was never told that she was to report to Wayne Rightout. After her transfer, she continued to receive her paychecks from Burns. (Tr. 833, 838). Burns remembered that he had transferred Complainant to the H building and he recalled giving her her paycheck on at least one occasion. (Tr. 362-363).

When Complainant was transferred to Vanes and Shrouds, Burns told her that there would be an I.S.I.D. investigation of the incident of July 27, 1992. (Tr. 149). Elmore was still working in the main area of Department 981 the next work day, but toward the end of the day he was reassigned to work in the H building. (Tr. 144, 362-363). After Complainant was reassigned to Vanes and Shrouds, she spoke with Richard Ewith ("Ewith"), an inspector from Department 981. He told her that she should watch out for Elmore because he would do anything to get her terminated. She also spoke with a friend, Richard McCusker ("McCusker"), who also warned her to watch out for Elmore because he would do anything to get her terminated. (Tr. 631). Complainant responded to both Ewith's and McCusker's comments. She told them that she should not have to submit, under terms of employment, to be touched like that and that she would defend herself. (Tr. 146-147).

Burns called I.S..I.D. the day following the time clock incident and arranged for an investigation into the incident. Burns testified that he had refrained from attaching blame to anyone until after the investigation was completed. The investigation he arranged made Complainant the subject of the investigation. (Resp. Ex. 1).

Burns came by Complainant's work area about a week or two later. She did not discuss the incident with Burns. She told him that she should not have to submit that kind of bodily contact as a term of her employment and that she had a right to defend herself and would defend herself from it. (Tr. 147, 834). Burns did not react to Complainant except to say that "I'm not going to talk about this. We can't talk about this." (Tr. 147, 834).

Burns spoke with Elmore about the incident after it happened. Elmore testified that Burns asked him what happened and was willing to listen to his side of the story. Elmore stated that he had the opportunity to tell Burns his side of the story. (Tr 757-758).

When Elmore was engaged with Complainant at the clock, he was not defending himself. He continued his contact with her because he was determined to prevent Complainant from clocking out before he did. (Tr. 750).

### The I.S.I.D. Investigation of the July 27, 1992 Incident

I.S.I.D. conducted an investigation of the July 27, 1992 incident at the time clock. Investigator Carlos Burgos ("Burgos") investigated the matter. He interviewed a number of individuals in Department 981. He issued a report of his investigation. (Resp. Ex.1) Complainant was interviewed by Burgos on August 14, 1992 and gave him a statement regarding the incident. (Tr 147-149, Comm. Exhs. X, Y). Complainant told Burgos that there were terms in the statement which he used which she would not use. For example, she would not use the term "body jamming" Burgos would not change the statement. (Tr. 148).

22

Grous was interviewed by Burgos, on July 28, 1992. He stated that when he finished punching out his work, he turned and walked away. He got a few steps away and he heard a clashing movement behind him, so he turned. He saw Complainant's back and the front of Elmore. They were pushing each other at the time. He heard Complainant say "watch what you're touching." (Tr. 296-297). Elmore had his arm out. (Tr. 298). Grous did not see how the incident began. (Tr. 297-298). He speculated in his statement that Complainant and Elmore went to the time clock at the same time and clashed as they met. Then Grous went over to the bullpen to tell Burns what was going on. (Tr. 298). Grous admitted that, prior to the incident at the clock, he had had a personality conflict with Complainant. (Tr. 316.)

When Grous told Burns about the problem at the time clock, Burns stood up and looked over at the time clock area. He saw Complainant and Elmore both trying to use the time clock at the same time: "a couple of arms [were] going at the time clock together, and you could only ring out one person at a time." He could not see any pushing from where he was. (Tr. 347-350).

Irving was interviewed by Burgos, on August 5, 1992, and gave a statement in connection with the incident. Irving testified that she could not see the lower 4 feet of Complainant's body or Elmore's body. She testified that she could not see kicking or punching. She also testified that she looked at the area of the time clock and saw Grous at the clock and Elmore at the left side card racks. She then looked down at her tool box to work in it. When she looked up again, she saw Complainant at the time clock. (Tr. 792-794, 798-801, Resp. Exh.2).

Nightengale was a work friend of Elmore.(Tr.804). Mathew Betton ("Betton") gave a statement to Burgos on August 4, 1992. Betton Elmore.(Tr.804). Irving was a friend of heard some shouting and then saw Complainant and Elmore together at the time clock. He saw them very close together and leaning against each other and putting pressure on one another. He was located at Nightengale's surface plate when he looked toward the time clock. Betton saw the back of Elmore and Complainant was on the other side of him.

He saw that Complainant was at the time clock and Elmore was to her left. (See Ex. PP) Betton saw Complainant use her leg. She raised it off the floor about 4-5 inches and leaned with it against Elmore's hip. Betton did not Complainant pushing Elmore. (Tr. 586-588, 596-598).

When Betton's statement was taken there were about 6 or more people present in the room. He was asked about the incident. A handwritten statement was then prepared which Betton was asked to sign. Prior to signing it, Betton took issue with the fact that the statement said that he saw Complainant kick Elmore in the legs. That was not what he said had happened. The investigator told him that it did not matter, and then he signed it. (Tr. 607-611). Betton was still concerned about it. He spoke about his concern again that night with the investigator. He also raised this concern 3-4 times during the meeting. The statement was not changed to reflect his concern. (Tr. 591, Exhs. FF, GG). Betton observed an even confrontation by both Elmore and Complainant at the time clock. Betton thought that the discipline given to one of them should have been given to both of them. (Tr. 607-611).

23

## The Termination of Complainant's Employment

In July-September 1992, Burns reported to Berr, the Quality Manager of Department 981. Berr was the Quality Manager of Department 981 for less than one year at that time. (Tr.268-269, 343).

After the I.S.I.D. investigation was completed Quality Manager Berr and Burns received a copy of the Report. They reviewed and discussed the Report. (Tr. 365-366, Comm. Ex. HH).

Burns stated that he and Berr decided that Respondent was fighting and that she was the aggressor. (Tr. 384)

Burns did not know who started the time clock incident. (Tr. 479-480).

Under Pratt Policy, a case by case determination has to be made when considering when the use of force is self defense and when it is fighting. (Tr. 477)

Berr asked Burns what he thought about the decision to terminate Complainant. Burns made the recommendation to Berr that Complainant be terminated, because he decided that she was the aggressor. (Tr. 386).

Berr also asked Burns if he had any defense for Complainant. Burns did not offer any defense for Complainant. Instead, he tried to justify his recommendation to terminate her. (Tr. 417).

At that time, Burns had already dismissed Elmore from the consideration of termination. He appeared to remove him from the incident at the clock, except for one canceling of Complainant's attempt to punch out. He recommended that Elmore be retained. (Tr. 384-385).

According to Burns, a woman has the right to defend herself from a man who presses his body up against hers, but she may not if she is close to the man and knows he's that he's only fooling around. (Tr. 485-486).

The Respondent's General Notice regarding General Rules Regarding Workplace Conduct, dated January 22, 1992, states:

> One of these rules is the absolute prohibition of any behaviors which are contrary to common decency or morality or which are liable to incite or provoke such conduct.

(Tr. 403, Resp Ex. 11).

Burns could not identify any right of Respondent's female employees to defend themselves against male employees who pressed their bodies up against them. (Tr. 485-488).

Berr decided to accept Burns' recommendation that Complainant's employment be terminated. (Tr. 382-383, 386, 412-417).

On September 2, 1992 at 11:30 pm, the end of the work on the second shift, Burns approached Complainant and informed her that she was being terminated. He escorted her to the guard's shack, outside the plant. Complainant asked him for a pink slip, and he refused to provide one. He did not tell her that she could call a Union Steward. (Tr. 149-150, 387-388).

Complainant eventually saw a pink slip which indicated that she had been terminated due to a violation of company rules. (Tr. 161-162, Comm. Ex. 11).

On September 3, 1992, Complainant went to the Union Hall and spoke with Union Representative Scott Arsonault ("Arsonault") and filed a grievance. The Union people also told Complainant to file an appeal for her job. She filed an appeal for her job the next day. (Tr. 150-152, Comm. Ex. KK). The Grievance filed by Complainant went to arbitration within six months, due to the seriousness of the matter. The arbitrator ordered that Complainant be returned to work. She returned to work on February 26, 1993. (Tr. 152-153, 388).

Elmore only received a one day suspension for his involvement in the time clock incident on July 27, 1992.

### Economic Loss

### Back Pay

Complainant did not work at the Respondent's facilities between September 2, 1992 and February 26, 1993. (Tr. 153).

She did not work anywhere else during her period of unemployment. (Tr. 158).

In September 1992, Complainant worked 40 hours a week and was being paid a base rate of $17.18 per hour with a 10% shift premium because she worked on the second shift. (Tr. 153-155, Comm. Exhs. K, L, M).

In December 1992 there was a Cost of Living Adjustment (COLA) increase. Also every 22 weeks there is a $.10 adjustment to increase the hourly pay. (Tr. 157).

### Lost Benefits

Complainant was participating in Respondent's pension plan while she was employed. (Tr. 157).

Complainant was participating in IRA's and deferred salary savings plans, contributing the

25

maximum amounts allowable. (Tr. 157-158, 166).

**Mitigation**

Complainant applied for and received $6,624.00 in Unemployment benefits as a result of the Respondent's termination of her employment. She received $4608.00 in 1992 (Comm. Ex. W). She received $2016.00 in 1993. (Tr. 157-164, 258-260, Comm. Exh. 00)

Complainant searched for other employment but was unable to find full time employment during the period between September 3, 1992 and February 25, 1993. She looked for employment in Connecticut and in Massachusetts. She also searched through the classified help wanted ads. She sent out letters and resumes. She went on some interviews. The positions which she applied for were at businesses involved with machining and parts. (Tr. 160-161).

The Complainant and the Respondent have submitted a Stipulation on Damages dated August 31, 1998.

## IV. CONCLUSIONS:

All conclusions made are based upon the Findings of Fact set forth above and, where applicable, the precedent cited.

### A. SUBJECT MATTER JURISDICTION

1. Respondent's First Special defense alleges that the Commission has no subject matter jurisdiction over the Complaint in this action. (R-2)

2. The Complaint in this action was filed pursuant to Conn. Gen. Stat. §46a-82 on November 5, 1992. (R-1). The Respondent terminated Complainant's employment with Respondent on September 2, 1992. (R-1, ¶18; R-2, ¶18). The incident which lead to Respondent's action in terminating Complainant's employment occurred on July 27, 1992, within 180 days of the filing of the Complaint. (R-1, R-2). The Complaint alleges a violation of Conn. Gen. Stat. §46a-60(a)(1) and Title VII of the Civil Rights Act of 1964, as amended, as protected by Conn. Gen. Stat. §46a-58a. (R-1, Preamble). Pursuant to Conn. Gen. Stat. §46a-51 (8) a discriminatory practice includes a "violation of section ... 46a-58 [and] 46a-60 ...". A "'discriminatory employment practice' means any discriminatory practice specified in section 46a-60 ....." Conn. Gen. Stat. §46a-51 (7). Pursuant to Conn. Gen. Stat. §46a-56(a)(3) the Commission shall "investigate and proceed in all cases of discriminatory practices as provided in this chapter ..."

3. Accordingly, pursuant to Conn. Gen. Stat. §46a-82e; P.A. No. 96-241 and *Angelsea Productions, Inc. v. Commission on Human Rights and Opportunities, et al.*, 248 Conn. 392, 727 A.2d 1268 (1999) the Commission has subject matter jurisdiction over this action. The Respon-

26

dent's First Special Defense is, therefore, found to be without merit.[6]

## B. DISCRIMINATORY PRACTICES

Based upon the Findings of Fact above, the Complainant established a *prima facie* case that is a member of a protected class, i.e. - a female; that she was qualified for the position she held with Respondent at the time of the termination, that she was discharged for allegedly violating a work rule (i.e.- fighting); and that a similarly situated individual outside of her class (i.e- a male) was treated differently. The Respondent's proffered alleged legitimate and non-discriminatory business reason for the disparity in its treatment of Complainant and Elmore is that the actions of each on June 27, 1992 were different and warranted different treatment.

However, the facts found clearly show that, based upon a preponderance of the evidence, the decision to terminate Complainant was motivated by an improper gender bias against the Complainant. Notwithstanding Respondent's contentions to the contrary, this was not a case where "business judgment" insulated the Respondent from claims and proof of discrimination. Indeed, the undersigned does not question the business judgment or business decisions of the Respondent. However, this was a case of disparate treatment based upon Complainant's gender. In light of the Facts Found, the undersigned does not credit the "business" reason for Complainant's termination as set forth by the Respondent. It is obvious that the Complainant's gender was a factor, and perhaps a significant factor, relied upon by Respondent in its decision to terminate her employment. Adriani v. CHRO, 220 Conn. 307 (1991). The Complainant proved, by a preponderance of the evidence presented, that the discriminatory motive (i.e.- her gender) was the factor that made the difference in Respondent's decision to fire her. The Respondent's treatment of Complainant as far back as 1990, *inter alia*, assists in and compels this conclusion.

While Respondent correctly points out that the evidence of discrimination claims which are no longer actionable is not admissible unless such evidence makes the evidence of discrimination which is actionable more probable, Wingfield v. United Technogogies Corp., 678 F. Supp 973 (D. Conn. 1988), the prior actions of the Respondent and its employees in 1990-1991 clearly make it more probable that the action taken by Respondent in terminating Complainant in 1992 was discriminatory. It is clear from the Findings of Fact that during 1990-1991, the Complainant was discriminated against because of her female gender by both Respondent's male managers and other male employees who were contemporaries of Complainant.

Furthermore, the credible evidence compels the conclusion that the Respondent's rules with respect to "Fighting and Roughousing" were selectively enforced against the Complainant and not the Respondent's other employee, Elmore, who received only a one day suspension. Spulak v. K Mart Corp., 894 F.2d 1150 (10th Cir. 1990). Discrimination can occur where an employer discharges an employee pursuant to a legitimate policy if it does not apply that policy evenhandedly.

---

[6] For the reasons stated and based upon the facts found, the Respondent's Second Special Defense is also found to be without merit.

virtue of its disparate treatment in terminating the Complainant's employment.[8]

## C. DAMAGES

In Bridgeport Hospital v. Commission on Human Rights and Opportunities, 232 Conn. 91 (1995), the Connecticut Supreme Court ruled for the first time that General Statutes § 46a-86 did not authorize the CHRO to award counsel fees and damages for emotional distress as a remedy in adjudicating complaints of employment discrimination where the employer was alleged to have violated General Statutes § 46-60(a)(1). Moreover, our Supreme Court has made is crystal clear that General Statutes §46a-58(a) provides no basis for claims of discriminatory employment practices that fall within the scope of §46a-60. Commission on Human Rights and Opportunities v. Truelove and Maclean, Inc., 238 Conn. 337, 347 (1996) ("We are persuaded that §46a-58 does not encompass claims of discriminatory employment practices that fall within the purview of §46a-60 ... the specific, narrowly tailored cause of action embodied in §46a-60 supersedes the general cause of action embodied in §46a-58(a). [238 Conn. 337, 346]). While I fundamentally agree with the dissenting opinion of Justice Berdon in Commission on Human Rights and Opportunities v. Truelove and Maclean, Inc.,[9] supra, at 238 Conn. at 357, it is the duty of this Office to comport its decisions with the holdings of the Supreme Court and I am not free to breach the boundaries of those decisions. Jolly, Inc. v. Zoning Board of Appeals, 237 Conn. 184, 195, 676 A.2d 831 (1996). Thus, because the actions of the Respondent have been found to violate and fall within the scope of actions proscribed by Conn. Gen. Stat. §46a-60, there can be no recovery by the Complainant on its claim that the Respondent violated Conn. Gen. Stat. §46a-58(a). If the holding of the majority of the Court in Commission on Human Rights and Opportunities v. Truelove and Maclean, Inc. was consistent with the opinion of the dissent, it is clear from the evidence adduced and stated in the record that the Claimant would be able to recover for Respondent's violations of Conn. Gen. Stat.

---

[8] With respect to Respondent's Fourth Special Defense, the same is sustained as to any claims for damages for discrimination which occured in 1990-1991. This finding, however, does not invalidate the Complainant's claims for discrimination as it relates to the termination of her employment.

[9] "Section 46a-58(a) prohibits, as an illegal discriminatory practice, the deprivation of any right provided by statute or the constitution due to one of the factors enumerated above. Consequently, §46a-58(a) requires, by its own terms, another provision, be it statutory or constitutional, before it becomes operative. In other words, §46a-58(a) is triggered by a violation of an individual's rights, as provided for in another statutory or constitutional provision, on the basis of one or more of the following factors: religion, national origin, alienage, color, race, sex, blindness or physical disability. In this case, the statute that triggered the protection of § 46a-58(a) was §46a-60. Pursuant to §46a-60, individuals are guaranteed a workplace and terms, conditions and privileges of employment that are free of impermissible discrimination due to, inter alia, their sex. Because §46a-60 prohibits employment discrimination on the basis of sex, and sex is one of the factors enumerated under §46a-58(a), the CHRO has jurisdiction to award remedies that are available under either statute. I note that there are some forms of discrimination that are prohibited under § 46a-60, such as discrimination due to age or marital status, that are not within the purview of §46a-58(a) and that, therefore, §46a-58 would be inapplicable."

29

§46a-58(a).

Therefore, thhe Complainant is entitled to relief as set forth in Conn. Gen. Stat. §46a-86 for Respondent's proven violation of Conn. Gen. Stat. §46a-60(a)(1).

## V.   ORDERS

Pursuant to Conn. Gen. Stat. §46a-86 and the parties' Stipulation on Damages[10] dated August 31, 1998, it is hereby ordered that:

1. Respondent shall reinstate Complainant[11] to her employment with back pay in the amount of $18,750.00, less $6,624.00 in interim earnings which include unemployment compensation, for a total back pay award of $12,126.00.

2. The $6,624.00 deducted from the amount of back pay to which Complainant would be otherwise entitled shall be paid by the Respondent to the Commission which shall transfer such amount to the appropriate state or local agency.

3. Respondent is further ordered to reinstate Complainant's pension plan and allow her to participate in IRA's and deferred salary savings plans.

4. Prejudgment interest on said $12,126.00 award of back pay is awarded and shall accrue at the rate of 10% per annum from September 2, 1992 to the date of this decision.

5. Postjudgment interest on said $12,126.00 award of back pay is awarded and shall accrue at the rate of 10% per annum from the date of this decision until the award is paid.

SO ORDERED this 20th day of September, 1999.

Paul M. O'Connor, Jr.
Hearing Officer

---

[10] Having stipulated to damages and having offered no credible evidence in support thereof, the Respondent's Third Special Defense regarding an alleged failure of Complainant to mitigate her damages is found to be without merit.

[11] It is understood that as of the time of the hearing in this matter, Complainant had been reinstated to her position by virtue of a Union grievence procedure and decision.